In the time since this case has been briefed, there has been a veritable tidal wave of cases coming out against the position the government now takes, which is that this is government speech rather than government-compelled support for private speech. The beef case, the pork In addition, prior to those cases, the Third Circuit in, again, analyzing the Beef Act had rejected this in frame, and this Court itself in Cal Amend 1 had rejected the proposition that the Amend Act was government speech, relying precisely upon the frame decision under the Beef Act, which we claim that if the Beef Act was sufficiently analogous to strike down the amend program, then this Court's not strike down, but to say it's not government speech that held the amend program, then this Court's decision that the amend program is not government speech, likewise, applies back to the Beef Act. This Court made that determination. That aspect of Cal Amend survives the Supreme Court's later decision in Glickman, which only addressed the nongovernment speech aspects of the claim. And, in fact, this Court has repeatedly cited other parts of Cal Amend 1 for propositions that were not impacted by the Glickman decision. We think that's controlling. We think that's dispositive. In this Court, at least, we think that the decision has already been made that this is not government speech. On the United Foods issues after that, let me step back. The one other case that's important for considering the government speech issue is Keller. In Keller, we had a situation where the state law itself, California state law, said this was a government agency. Yet the Supreme Court said, based on factors strikingly similar to the frame factors, that notwithstanding that state law determination as a technical matter, that the State Bar was a governmental agency, it still did not qualify for the government speech doctrine to the extent that doctrine exists because of the specialized characteristics, funding by a discrete group, serving the interests of that discrete group, control by that discrete group, those sorts of things, attribution to the Bar, for example. All of those factors in Keller were dispositive of the question of whether or not that should be treated as government speech for purposes of the First Amendment. We think Keller controls this case as well, that there is no reasonable distinction. And in fact, that is the only Supreme Court holding on government speech. All of the other stuff the government cites in government speech is dicta. Perhaps persuasive dicta, if this Court chooses to follow it, but dicta nonetheless. The only binding authority is Keller, and we think Keller makes it impossible to conclude that the B fact is government speech. Finally, on the other issues, the United Foods issues, the Central Hudson issues, as we said in our reply brief, we think those are frivolous, completely frivolous at this point. The government itself in seeking cert on United Foods said, this is identical to the B fact. If you strike down the mushroom act, you'll have to strike down the B fact. And lo and behold, when that happens, they run to the hills and say, well, we didn't mean that. We don't think that's a reasonable argument at this point, particularly in light of this Court's decision in Delano Farms, emphasizing the notion of collective activity, distinguishing sort of these peripheral regulations on speech and on information and consumer safety as not being sufficient to get you back into the Glickman world, but to keep you stuck in the United Foods world, we think those are all dispositive, again, of this. On the government speech, the test we would propose is that you should take into account the four frame factors as sort of expanded upon by Cochran, LMA, and Michigan Pork Producers. And those would be funding by a discrete group, non-attribution to the government. The government does not claim this as its own. It does not say brought to you by the Department of Agriculture. Nexus with the funding, with this discrete group of funders, i.e., nexus to the beef producers, so you have ads that say brought to you by Nebraska's cattlemen, brought to you by America's beef producers, that nexus to the discrete industry segments, we think is very persuasive evidence that it is not the government speaking or a — It's another form of attribution. Well, it's the two sides of attribution. It's is it attributed to the government, and is it attributed or indirectly associated with a private party? So you could, for example, have a situation where the speech was attributed to the government, Woolby v. Maynard, a state license plate. No one doubted who was speaking on the license plate. Yet there was still a close nexus to the private party as well, which disqualified that kind of speech from any lenient treatment. So that's why I break them out as two separate things. Satisfying  And finally, who generates the speech? In this case, the government may exercise as much sensorial control as it likes, but at the end of the day, not a word gets spoken unless it is generated by the beef producers, unless it is approved by the beef producers, and unless it is what they want to say. The government might take an idea and an ad campaign that comes from the beef producers and say no, but that's what the government does every time it regulates speech. If that is enough, that sort of negative control and the coercion and arm-twisting that goes with having that negative control, it's sufficient to convert private speech into government speech. Well, then any censorship program is now government speech because that's precisely what censors do. The worst case scenario under the First Amendment, a prior restraint of speech, would be government speech. If my clients, the charters, were required to submit every advertisement that they wanted to run to the USDA and the USDA said, no, we don't like that ad, change it a little bit, no, we don't approve that ad, they'd have exactly the kind of control that they're claiming to have here if we wouldn't for a second think that was government speech. We would think that that was a First Amendment abomination. Does your claim depend on your clients disagreeing with the message of these ads? It does not. I do not believe it depends on that at all, but let me assure this Court that my clients vehemently disagree with the message, much like in the Cochrane case. My clients are independent ranchers. They have a very different philosophy about how to go about raising cattle. They use grass-fed cattle, hormone-free, no antibiotics. And the ads that say, eat hormone-injected beef. Well, two things. One is just like in the Cochrane case, the milk case, the ads that treat beef as generic imply that all beef is the same, notwithstanding the salient distinctions my clients think exist between different sources of beef. Precisely the same point made in the Mushroom case in the Supreme Court, precisely the point in the Cochrane's, between generic milk ads versus the specialized milk. What about the sign saying, eat beef, or something? I may be inclined to go by your clients. Well, my clients think that a sign that says, eat beef, is misleading in that it says, any beef is fine. Let me also point out, by the way, that it's not just an ad that says, eat beef. This money goes to do a lot more speech. For example, it goes to take positions on irradiation and things like that. The primary contractor that claims to be speaking for everyone because it gets all the checkup dollars takes lots of positions, policy positions. Not commercial speech, but political speech that my clients abhor on things like use of antibiotics or irradiation. And lastly, of course, some of this money actually goes to branded advertising. Hormel takes this money and runs the ad saying, eat beef. Hormel, heat and serve products. Aren't they wonderful? They got an award for that from the Beef Board. That is appalling. Does the record show whether your clients, the charters, get a premium for their beef, for their natural beef, or whatever? I don't know exactly how you describe it, but does the record show? I don't want to know if it's not in the record. I don't believe that the record specifies the profit margin. I don't believe the record in this case shows the profit margin. What I will say is that in the United Foods case, there was ample evidence of premium, some greater premium. I understand. No, I don't believe there's any evidence of that. In the United Foods case, however, there was considerable evidence, and the Court picked up on that in its holding, that generic advertising sort of undermines branded or specific advertising and makes it harder to accomplish that market distinction that my clients would otherwise make when they market their own goods, about we sell a better variety of beef, it's not fed cow brains, it's not subject to mad cow, any of that stuff. And they recognize that generic advertising makes something more like a commodity, when in fact, you have market segmentation, even within things that we otherwise think of as commodities, because there are different ways to produce them, different ways to sell them, different ways to raise them. Does the record include advertising from the charters? I don't know if the record includes that. I know the administrative record certainly had some advertising from the charters where they tend to sell locally when they sell their own product for slaughter or to markets and stuff like that. And I believe the administrative record had that. I don't know if it's in the record on appeal, whether that was there or not. There certainly was ample evidence of the kinds of advertising that the Board itself does, including some references to branded advertising where the charters are literally paying for their competitors' ads, which, unlike United Foods, presents a far worse case where, of course, they disagree with buy Hormel. They don't want you to buy Hormel. They want you to buy Charter Ranch Beef. All right. And then, look, from looking at the analytical framework for decision, the first question is, is it government versus private speech? Yes. You said, do you really think frames is still good law? Absolutely. And, in fact, the Third Circuit We're in the Ninth Circuit, so you said follow frames. That's been questioned. And then we have downs, which probably is relevant. It's relevant, though I think easily distinguishable and in some ways supports our position. Right. That's what I was saying, the way they analyzed government. They found government is better than private speech in that case. But the method of analysis, you were suggesting we do this four-pronged? Yes. Largely comes from frame, right? Yes, correct. Well, like I said, this Court has already, in Calum, in one adopted frame, and I maintain that that portion of Calum in one was unaffected by the Supreme Court's GBR based upon Blickman. But, secondly, in the Cochran case, the Third Circuit itself has said our original frame case remains good law as to the government speech aspect of that case, even though everything else in frame has been dumped. And they make precisely that distinction, that case law since has overwhelmed all the pro-government aspects of frame and kept intact the government speech analysis that said it was not government speech. So to the extent that this Court found that segment of frame persuasive in Calum in one, there is no reason to go back on that when the original frame, the frame court itself, the Third Circuit, continues to maintain the vitality of that segment of the frame decision. I don't see any reason to imagine it was undermined when the court that would be most bound by it still considers itself bound by it. If we agreed with everything you said, what kind of an order would you expect or want? We would expect an order reversing and remanding to the district court to enter a judgment that says the beef act is unconstitutional. Given that the beef act is non-severable, it would strike down the entire beef act. We would then like a refund. We have sought one of our remedies, a refund. I believe that issue would probably need to be litigated further at the district court. So a remand to – I think this Court is fully entitled upon determining that the beef act is unconstitutional to say that it should be enjoined. In Keller, did the Supreme Court say that you can't collect anything, or did they say you can't collect the part of dues that is going to non-germane? That is correct in the union cases and in Keller as well. The distinction with the beef act is that the beef act is non-severable. So if you take out the major portion of this act, which is promotional activities Where do you get the non-severable? That's cited in a footnote to our reply brief, I believe. It comes from the legislative history of the case that we've all cited and I think is largely agreed upon and that even LMA agrees with. There used to be a severability clause in the 1979 version of the act. In the 1985 version of the act, they removed the severability clause. And this is – you can see this attached to the statutory appendix to our blue brief, where there's that description. I will tell you exactly where you can find that. There it goes. No, it's in the statutory appendix. There we go, on page 243, number 243 of the appendix. They describe the removal of the severability clause, which makes sense. In the normal severability context, you say if the primary purpose of the act has gone away, you don't leave the tail hanging while the dog has been thrown out. And if you remove promotion from the beef promotion and research act, there's not much of a tail left. You usually go through that analysis even when there is a severability clause. Well, you go through that when there is a severability clause. When there's not a severability clause, and in fact, a strong inference from it having been removed from the act, I don't think you need to go there at all. I'm just pointing out that it makes some sense. So what do you think is the appropriate analysis if we decide that this is private speech? I think United Foods is, I think, is pretty squarely. Does United Foods answer Judge Canby's question, where it says that the principal object of this act was? Absolutely. And it corroborates this notion that once the principal object of an act is gone, you don't leave the tail wagging solo. Then does the central Hudson commercial speech doctrine come into play at all? Not at all. I think Glickman squarely points out that that's the wrong analysis for compelled speech. That's the analysis for restrictions on speech. I think United Foods said that it doesn't even matter whether this is commercial speech because the analysis doesn't change anything. Union speech is frequently commercial speech if you apply a Booth Keller. What I would suggest is that you apply the test in the Supreme Court's decision in Leonard versus Ferris Faculty Association, I believe, which gives sort of a three-part test that's derivative of Booth, Ellis, and all of those union cases. And that test can be found on page, let's see, on page 519 of the Ferris opinion. That's the majority test adopted by five justices in that case, even though there were some pluralities floating around. That's the clean test. There's no way they can pass that. United Foods points out in the absence of a collectivized conduct, collectivized sales, for example, that collective speech doesn't, isn't germane to anything else but itself wouldn't survive here. A quick comment on Downs. In traditional compelled speech cases, if the speech, if private speech is being compelled by the government, you stop there. Isn't that correct? No, it's usually in compelled speech. Well, if private speech literally, if they force me to stand up and talk. I'm thinking of the Keller case. What they ask is whether the speech being compelled, the support for speech that's being compelled, is germane to some non-speech object of the association, regulating the bar in Keller, collectively bargaining in a boot in that line of cases. So you would have that test, but here United Foods answers that. There is no non-speech conduct going on that this speech would be necessary to implement. The notion that it's germane to the generic goals of making nice with the economy, of helping the beef industry, is not what the germane analysis is about. Otherwise, the United Foods would have come out the other way. What it is about is being germane to performing some non-speech act that you need to talk to. You have to talk to a bargain in a collectively bargained situation. The compelled speech here is not incidental to some larger regulatory program, right? Not merely incidental to, but sort of part and parcel of implementing the larger regulatory program. You need to speak to your union members before you can go bargain on their behalf. You need literally to speak to the people you're bargaining with in order to enter into a contract. It's that kind of, it's not incidental as in just off to the side. It is more integral to that. You can see that in the Leonard case as they describe the evolution of this law. Leonard puts a very nice description of that. In fact, eight justices in Leonard would have struck down PR programs that said teachers are great. Eight justices, four in the original plurality, and four in the dissent who would have applied to an even stronger standard. So we think it's pretty clear under that standard, PR like this, advertising wouldn't work. If I might save the remainder of my time for rebuttal, if there's no more questions. Thank you. May it please the court. My name is Matthew Collette from the U.S. Department of Justice on behalf of the U.S. Department of Agriculture. Richard Rogier is with me for the interveners and will be taking five minutes of the argument time. I'd like to begin by addressing the notion that this is something similar to the government exercising negative control or a veto over speech by, for instance, the charters. This is not at all like that. This is a program established by Congress to communicate a particular message. A message that is formulated with USDA input from the beginning by a board that is appointed by the Secretary of Agriculture, subject to removal by the Secretary of Agriculture. And the control is not merely negative. The record is very clear that in addition to participating in the generation of these programs from the beginning and having input from the first meeting to the last meeting, attending all meetings, Barry Carpenter of the Agricultural Marketing Service will actually say, here are things we want you to focus on, Beef Board. And this is at page 21 of the joint appendix. Mr. Carpenter's affidavit says, yeah, and here are some examples. I wanted the board to focus on BSE, mad cow disease. I wanted the board to do some research on E. coli. I wanted the board to address issues about exports to Japan. And when I do that, that's what the board does. So the notion that this is something like censorship of private speech is wrong. And I also think it's wrong to say the Supreme Court has never held that government speech has existed. The Rust case, in fact It doesn't seem like it's censoring the charters, prohibiting them from saying anything they want to say independently. But it does seem like it's forcing them to join in this industry voice. It is using this assessment on economic activity, the sale of cattle, to fund this message. And where the message is government speech, that is entirely permissible, Your Honor. Why would it be government speech if it's an independent? Tell me the nature of the board again. The board is made up of. Made up of like industry executives who are appointed. They're industry, yes. They have to be industry people. They are appointed by. Not like government lackeys or, you know, government employees. They don't take their orders from the government. If they're if they're CEOs or CFOs or just, you know, people who work in the industry, they come in and they sit on a board and they may hear what the agenda is, what the government thinks they should consider. But don't they then exercise an independent judgment as a fiduciary for the for the board? No, it's not like a board of directors over over a private corporation. It is a board who will, in conjunction with USDA, decide what ads to run, what promotions to do and how to do them. And that's what the government wants. They want the experts, the people who know the business. Doesn't the government want them to exercise an independent judgment on that board? Well, the government certainly wants their input and their perspective. But don't they have to make that make an independent judgment, I guess, is my bottom line. Maybe I misunderstand it, but I recognize it's not really like an analogy to a board of directors. But in this type of a board, aren't the participants still required to come to their own conclusion? And in other words, they can't just take a directive from the from some government official. Well, certainly they will exercise a degree of independent judgment. But remember, one, they're subject to removal to every decision they make, every contract they enter into, every proposal that they adopt, every advertisement, if a proposal ultimately is approved, every advertisement has to be submitted to USDA. Let me ask you another question. Are there any activities at all of the BEEF board that are funded by government funds as opposed to the check-off system? There is an aspect in which there are matching funds involving international issues where the check-off funds are combined with these matching funds. We think these cannot be characterized as private funds. And in fact... They're industry funds. They're compelled payments. Well, once the payments are made, they're no longer industry funds. They become check-off funds. They become funds subject to this government-run program. Do you know of any case, I'm going to set aside for a minute, the piece that you say the government actually matches? I think there are issues with the matching. But aside from that, do you know of any case where it's been held that it's government speech where the government doesn't fund it at all? No, Your Honor. I don't know that there's any such case. I think the fact that it is funded in this manner shouldn't control at all. If you could imagine a situation where you earmarked funds or you said, for instance, barring an analogy from the Brown case, which involved the hanging of American flags over overpasses. If the Transportation Department of California had said, we're going to use tolls from the Golden Gate Bridge, and then we're going to use that money to hang American flags over the overpasses, then it would be no question that that's the government who is speaking when it's hanging the American flags. Aren't tolls more like taxes than forced assessments? Well, no, I don't think they are, Your Honor. It's these assessments are, it isn't just showing up at a rancher's door and saying, I've counted, you have 20 cattle, give me $20. It is an assessment that occurs when a head of cattle is sold. It's so it essentially is an assessment on economic activity. So I think it is similar to a toll or entrance to a national park, for instance. Does the dollar get paid into the Treasury? No, it doesn't go into the Treasury. It goes to the Beef Board and to state associations who work with the Beef Board. And if the beef producers vote against it, the whole system stops. Is that right? Yes, I think that's an important political check on the program. And I think one of the key reasons why government speech is subject to different rules, that is, people are obviously going to disagree when the government speaks. And the solution is a political one. We have a politically accountable employee, the Department Secretary of Agriculture. We have another political check. That is, if you don't like what the government is doing here, you vote the program out. Or essentially, there's even a third one, is you get Congress to change the law. But I think the point is, and Downs, I think, is instructive on this point, is who is calling the shots, who controls? Because in Downs, you had teachers who were putting outside their classrooms material, some material prepared by third parties. And this court, in fact, expressly rejected the notion that the attribution or how the public would perceive the speaker is important. And said, rather than focusing on what members of the public might perceive the speech to be, it's more helpful to focus on who is actually responsible for the speech. So who's responsible? The government. But I'm just having trouble viewing these beef industry executives just sort of dancing to a tune that the government calls. I mean, it seems they exercise an independent responsibility on this board. Maybe the government sets the agenda. But they're really, they seem private in their nature when they make decisions. Well, just as in Downs, the teachers exercise their own discretion within certain bounds. And this court said, just because the principal isn't roaming the halls and pulling everything off every day doesn't mean that it isn't the principal or the school board that has the ultimate control. And in any situation, you're going to have a degree of discretion. If you hire a contractor, the U.S. Army hires a contractor to devise advertisements. There's certainly going to be a degree of discretion on what to do. Executives aren't, like, hired by the government, though. Yes. And that's exactly what the government. This is the beef board. Again, it's appointed by the Secretary of Agriculture. There are members of the industry. I don't know how they're appointed, but they seem like people of stature who can't be viewed as the government. I'm not saying the government doesn't have people of stature. But they seem like independent industry people. Thank you, Your Honor. I mean, we're part of the government, too, here. Years ago, I must have had some litigation that involved people who owned a lot of cattle. It's hard for me to view them as thinking they're part of the government. Well, Your Honor, I think governments often will appoint citizens' commissions, will appoint ad hoc committees to advise the government or to be involved in certain aspects of government. And they may be leaders of industry. Well, they are doing that job on their board or commission. I agree with you there. I mean, the government can have a government entity, and they appoint private people to serve on the government entity. But you realize that you're asking us to make a ruling that would create a circuit split. Yes, Your Honor. I think by the time the Court rules it, it may be irrelevant, since we have filed petitions for cert in both the LMA case and the Michigan Port case. And I expect the Court to decide those probably about mid-May. To decide whether or not to grant cert? Yes. Which means they'll be heard sometime next year. Yes, next term. How long ago was certified? Pardon me, Your Honor? How long ago? When was the first cert petition filed? We filed on February the 19th. And the respondents got a 30-day extension. Their response is due the 19th of March. I'm sorry, of April. And is there a circuit split? There's no circuit split now? No, Your Honor. There is no. So you're hoping the Supreme Court will grant cert in the other cases? Yes. But we do think that frame was incorrect. And that subsequent case law, not only we have rust, I think if you looked at this case, if this were a case in which the Beef Board or a member of the Beef Board brought a lawsuit against the Secretary of Agriculture saying, you've imposed a gag rule on me, I wanted to run this taste like chicken ad, which is discussed in the record, and you wouldn't let me do it. You are infringing upon my First Amendment rights. That is rust. And rust would control that. And rust would compel the conclusion, as subsequent Supreme Court cases have said, that that is government speech. The government has defined this program. The government has set the agenda. This is what the program has to say. Which particular? I have cited seven USC sections, 2903 and et sec. What's the particular? Is there a particular provision that specifies the duties of the persons who are appointed to the Beef Board? Yes, there is, Your Honor. And which section is that? I believe it's in the statutory scheme section of our brief. And both the act and the order talk about what activities they will do. Let's see. Well, I don't want to dig up too much. It's in your brief. The act does say you will, the board will come up with these advertisements that are designed to promote beef. And again, I think the record here is very, very clear on this, that USDA officials are the ones who are calling the shots, so to speak. They are at every meeting. And they- That's the part I'm having trouble with. Maybe I'm operating too much of an intuitive basis. I'll look at the statute. But I just am having trouble viewing a USDA official as calling the shots for an independently constituted board. Maybe they staffed something and they set an agenda, but when policy issues are decided, I expect the beef industry executives are making up their mind about what they think is best for their industry. Well, I don't think that's consistent with the record. Certainly their expertise comes into play. And I think as a practical matter, USDA is going to listen to them. And that is why they're there. They're there because they have the expertise. But the record very clearly shows that even when they're discussing possibilities, in their mind is, is this going to fly with the USDA? And Mr. Carpenter testified and Mr. Reese both testified that they are constantly in contact. USDA officials are there at the meetings. They are speaking up or they're speaking in the hallways behind the scenes saying, wait, this isn't consistent with what we want to do. You may have to tweak this a little bit. And every, everything they do has to be submitted for advanced approval. Are there board members paid? No, Your Honor. And again, they are appointed by the Secretary of Agriculture and subject to removal. When they're appointed? They are, I believe it's two-year terms and they're staggered. Normally in that kind of a board, like if the Secretary of Agriculture, after they're appointed, they're confirmed to the position, doesn't like what they're saying, Secretary of Agriculture can't just go say you're fired, like Donald Trump. I mean, the Secretary can, and I believe the Secretary can and has removed board members. What's the statutory standard? I mean, obviously there are grounds for removing board members, but can a secretary just remove any board member whose opinions he or she doesn't like? I think the Secretary, the order talks about removal for cause. And certainly the Secretary can. Cause, okay, well, so it's for cause. Well, I gave you an order. I said you should start running ads, beef is what's for lunch, rather than beef is what's for dinner. And you're, you're bucking me. And you keep sending me these ads that I have to disapprove. If it's a beef, if, if like the, for the president of the such and such a state beef cattlemen's association, bucks the Secretary of Agriculture, is on this board, and then disagrees with what the government official says that's caused to fire them immediately? Well, certainly if, if the Secretary is unhappy with the way the program is working and that the Secretary's made it clear, I want you. I'm going to study the statute further. What differentiates the Beef Promotion Act from the Mushroom Promotion Act? In other words, why doesn't United Foods just control those kids? Well, the, the Beef Act, the, the acts themselves are very similar, but the statutory schemes surrounding them are, are very different. There are, yes, we have, and I, I'm, I'm getting a little nervous cause Mr. Very briefly, there, there is a grading system that will voluntarily, voluntary covers 95 to 97 percent of the meat. And in fact, as a practical matter, directs how beef is marketed. Essentially having collective aspects that you didn't have in the mushroom situation. All right. Why don't you, thank you very much. Thank you, Your Honor. We'll hear from your co-counselor. Good morning, Your Honors. I'm Richard Roser. I represent the pro-Chekhov intervenors in support of the government side in this matter. And I will try to be brief. I wanted to respond to some of the questions that had just been put to Mr. Collette. Number one, Your Honor, Judge Wardlaw, I believe you asked about whether there's any case where government speech was found to exist where the government didn't fund it. If that means there was a targeted tax, such as the beef assessment, the answer is yes. The Bonta case involving R.J. Reynolds with the targeted tax on tobacco companies, the judge in the Eastern District found that that was government speech. We've cited that, and that is certainly relevant on many aspects of the matter before this court. I would also note that the trial court in Frame, a long time ago, found that the Beef Act was government speech. Obviously, that was reversed by the Frame decision of the Third Circuit, but they did so hold. Obviously, you have the decision below that found government speech, as well as the district court in the District of Columbia found for avocados, the Avocado Board, with that targeted assessment, it's government speech. So, certainly, there are many judges, many cases where on these facts, or very similar facts, government speech has been found. So, if I understood your question correctly, focusing on have they found government speech where it's a targeted tax, the answer is yes. Also, I'd point out Southworth, DICTA. It would be a little narrow. Ninth Circuit or Supreme Court authority on that point, and that's it. Well, I was just going to the Supreme Court. It's DICTA. It's not the holding, but I think it's very important DICTA because in that case, it involved an activity fee by the University of Wisconsin, which is an instrumentality of the state of Wisconsin. And the university didn't adopt the speech as its own. So, therefore, it wasn't analyzed as government speech, but the Supreme Court decision said if the university had said it was its own speech, it would have been appropriate to analyze tuition, which is analogous, I would submit, to a targeted tax on beef as providing for the support of government speech in the Wisconsin Southworth case. That's DICTA. That wasn't the holding, but I think it's very relevant here. I would also point out that with regard to your Honor's question on United Foods, United Foods did not decide government speech. Glickman didn't decide government speech. The Supreme Court has never decided government speech. Therefore, if, and I think what the government speech, I'm sorry? They held that the State Bar of California was not a government entity, but they described the government speech concept there. But they found that the State Bar was more analogous to a union, and it didn't operate like a government. Here, your Honors, this message, this pro-beef message, was decided by Congress. Congress said the government should promote beef, and the reference has been made to beef industry executives serving on the beef board. They're cattle producers. They pay the check off. They're not dissimilar from Mr. and Mrs. Charter that are the petitioners here. So it's not like you have the executives on one side and the small farmers on the other side. They're cattle producers. If they're appointed to the board and they come off of a duly certified state organization, you know, to get the appointment, do you agree with the government's position that if the secretary just doesn't like their opinions or doesn't like their votes, they can be, that that itself would be cause to can them? Because that just doesn't sound right. Yeah, I think it is a for-cause standard. I don't think the secretary has ever gone there, and as a practical matter, I don't think she ever would. But for-cause normally means things like they don't come to the meeting, or if they come to the meetings, they're, you know, they're not sober, or they're not doing their homework. I agree. Doesn't this mean that somebody disagrees with their vote? But the key point here, your Honor, and it's very crucial, the secretary doesn't need to exercise that power to get her way. And this isn't just academic debate. This has happened. The reference was to the beef producers. As a group, they tend to not like chicken, okay? So they did an ad that was anti-chicken. When you have rattlesnake or lizard, you generally think, hmm, tastes like chicken, beef. It doesn't taste like chicken. The beef producers on the beef board loved it. Barry Carpenter, USDA, no. That ad never saw the light of day. That is the reality. Also, significantly, this record here was largely taken from the LMA trial, all right? One of the plaintiffs in the LMA testified, and it's key here because he is a challenger, yet he served on the State Beef Council in South Dakota, okay? And as an adverse witness, he indicated that the USDA really stops ideas early on in the process from ever seeing the light of day because the people serving on the State Beef Council know that it won't pass muster. That gentleman in the excerpts of record at 214, Johnny, I forget his last name, but his name is Johnny, he says, that's what they tell us at the Beef Council. You come up with a program or something like this, and they'll say, well, it probably won't fly. You say, why won't it fly? And they say, because it might at headquarters, but USDA will not go for it. So they have the last say. That's from an adverse witness. That's from a challenger. So this message created by Congress and facilitated by the beef board and the operating committee process is ultimately controlled by the USDA. And I think Downs is fully on point, as Judge Siebel found, and it focused on the control of the principal over the bulletin board. It's the same control of the USDA over the billboard, and that's the proper analogy. Finally, I would say the references to Santa Fe is also important to consider here, where the prayer was deemed to be a government prayer, and therefore, essentially government speech in the Santa Fe school case. Just like in Lebron, with Amtrak being essentially the government, where you had very similar factors going on. And I know my time, I'm way past my time, but thank you very much. Thank you. Next one right here. This court should be appalled by the depth of the big lie the government is willing to tell in trying to save this program. The notion that they could remove someone because they didn't agree with his opinion is a complete fabrication. In fact, the beef board itself describes itself as a business run by a board of directors and accountable to the producers. Page 29 of the blue brief, you can see the quotes from the board itself. If what the government is saying now is true, what the beef board has been saying to the public and to its members and to Congress since this program was adopted has been the most stunning lie imaginable. If that kind of government speech, the big lie that they won't even claim as their own is protected under the First Amendment, we have lost our way. Was the First Amendment violated when the secretary killed the chicken? Yes, absolutely. And in fact, even before you get there, that was such an abuse of discretion and a violation of his legal duties that he should have been challenged on that in an administrative process because he had no authority to do that under the act. But of course, because the beef board is sort of... Would it have violated the First Amendment? My answer is yes, it would have violated the First Amendment. Board members? Yes, absolutely. Just as if the government walked into a union and said, union, you have to negotiate and say we want to promote abortion rights. That would violate the union's rights even though the union exists in some part through government coercion. It would still violate the union's rights and the union would be very justified in making that claim. The board here, too, would be justified. I want two things. The notion that the board is responsive to the agency is not any different than any regulated entity responsive to a censor. A censor with enough power and willing to abuse it as the agency is will certainly coerce people into saying what they want. That's the harm of prior restraints. The notion that that converts it to government speech seems to stamp things on its head. Yes, he strong arms them from the get-go, but he does so without legal authority. He does so only because he could veto the whole program in its entirety. And that negative check does not, nonetheless, mean he can generate speech. What he can never do is force them to run a program. The example that Mr. Collette gave, that if we ordered you to run this ad about Mad Cow, you didn't, you're fired. Complete fabrication. Not in the record. Couldn't happen. It would be the most stunningly illegal act by the USDA you could ever imagine. And if the beef producers knew that was possible, this program would have never been adopted. Never. Go back to the frame analysis of the legislative history, all cited in our brief, and everyone from soup to nuts says this was a facilitating program, a self-help program, that the government has now decided to take over by the sole act of Mr. Carpenter, an administrative agent. It does provide for the secretary to approve the speech by the board. Or to disapprove it. And the reason it does so is, much like any ombudsman, if they try to speak beyond the scope of the authorized collective behavior, of course you're not going to let them do that. If they went to lobby Congress about raising taxes or lowering taxes, that would be ultra vires, basically, and that's why he gets to veto it. That is true. They could have a standoff where the board wants to say certain things, and the secretary can veto that or can block it. But what the secretary can't do is tell the board, you must say this. Absolutely. Which is what, by the way, distinguishes this case from Downs and distinguishes this case from Bonta. Which in both instances, the principal in Downs, anything he wants to say goes on that bulletin board. Complete control over that bulletin board. It is all within his power. He is a government employee. It is attributed to the government because it's on government property. Everyone understood that that was government speech. And that case, by the way, was really the government resisting the imposition of a third party to make the government speak something it chose not to speak. That is not the case here. This is the flip side of that, which is exactly what the three recent cases point out. Compelled support is very different than resisting the imposition of someone else's views upon the government. Bonta, likewise, attributed to the California Department of Public Health. They have full discretion. They can run anything they want. They are certainly not accountable to tobacco companies as to what they do or don't say. And they don't ask for tobacco companies' advice when they say, by the way, the tobacco company executives are evil. Such a distinguishable case that it really is not implicated here. The last thing I sort of want to point out is the Santa Fe. Mr. Rossiter cites Santa Fe. Santa Fe, unfortunately, as cited in his brief, is nowhere to be found in the U.S. reports. The key sentence is nonexistent. It is manufactured. It was manufactured by the district court below. Probably a mistake. Mr. Rossiter's version of the manufacturer comes after we point it out in our opening brief. The notion that that supports his position is insanity. And our blue brief, of course, points out that other aspects of Santa Fe, dealing with Southworth, make it perfectly clear that even if that were political speech and not religious speech, it would have been unconstitutional. And that's the example I gave where the students get to vote on whether to have a political speech and whether to have a demo or a republic today. Same thing here. What you have is the beef industry voting whether to have speech at all and then voting what type of speech to have within that. And even though the government reserves the right to check that, to stop that, once again, that doesn't distinguish this from any form of censorship. If that is what government speech is, three or four lines of Supreme Court precedent go away. At the end of the day, Keller, Keller is what controls this case. They have never once tried to distinguish Keller. All they say is, we don't think funding matters. Well, the Supreme Court does think funding matters. That's Keller. Funded by dues. They want to call those dues a tax on the economic activity of being a lawyer. That's just nomenclature. As a practical matter, you want to call them the government, you want to call them highly regulated, the bar is highly regulated. That's the whole point of getting them together to help give advice on regulation. But the bar's speech was still not entitled to the privileges of government speech, even though state law said it was the government. Wasn't enough. This is exactly like that. Nothing they've said distinguishes that, and I think that is quite distinguishable from the down scenario, where you do have government property, government employees, and full, unadulterated control. Principal can generate speech. The Secretary of Agriculture cannot generate speech lawfully. He may coerce people and arm twist people into saying what he wants, but that shows you the problem of censorship. It shows you the problem of government involvement in private speech, is that of course the government uses that involvement to twist people's arms. That's the problem. That's the point. Thank you very much. I thank both council for excellent, all council for excellent arguments in the case of Charter versus Department of Agricultural. Agriculture is submitted and we will take a brief recess.
judges: Canby, Wardlaw, Gould